193 N.J. Super. 244 (1984)
473 A.2d 539
PATRICIA EYRICH, AS GUARDIAN AD LITEM FOR MARY JO EYRICH, AND EDWARD EYRICH, AND PATRICIA EYRICH, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
CONNY H. DAM, D/B/A MISS CONSTANCIA LEOPARD & JAGUAR; ROBERT EARL D/B/A ROBERTS BROS. CIRCUS; SCHOOLEY'S MOUNTAIN FIRE PROTECTION ASSOCIATION; BOARD OF EDUCATION OF THE TOWNSHIP OF WASHINGTON; WILLIAM BLEISNER D/B/A WILMER ASSOCIATES; CARLTON YOUNG, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 1983.
Decided January 24, 1984.
*246 Before Judges BOTTER, PRESSLER and O'BRIEN.
Thomas M. McCormack argued the cause for appellants (Thomas M. McCormack and Russ Molloy on the brief).
Kevin F. Colquhoun argued the cause for respondent Schooley's Mountain Fire Protection Association (Colquhoun & Colquhoun, attorneys; Robert F. Colquhoun on the brief).
Donald L. Berlin argued the cause for respondent Roberts Bros. Circus (Lieb, Berlin & Kaplan, attorneys).
Feuerstein, Sachs & Maitlin, attorneys for respondent Board of Education of Washington Township, filed a letter brief relying on brief filed by respondent Roberts Bros. Circus.
*247 Donald Berlin, attorney for respondent William Bleisner, filed a Statement in Lieu of Brief relying on brief filed by respondent Roberts Bros. Circus (Lieb, Berlin & Kaplan, attorneys).
Gerald Kaplan, attorney for respondent Carlton Young, filed a Statement in Lieu of Brief relying on brief filed by respondent Roberts Bros. Circus (Lieb, Berlin & Kaplan, attorneys).
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiffs Edward Eyrich and Patricia Eyrich appeal from a summary judgment dismissing their complaint on the ground that it failed to state a cause of action upon which relief could be granted. The gravamen of the complaint was the emotional damage each of the plaintiffs claimed to have sustained as the result of a fatal attack by a circus leopard upon the five-year-old child of a neighbor whom they had taken with them to the circus performance. The issue is whether, under the totality of the operative circumstances, that damage is compensable by any of the defendants, each of whom was in some way involved in presenting the circus performance.
The record on the summary judgment motion included the product of extensive discovery. That record, viewed most favorably to plaintiffs, establishes a factual background requiring some detailed exposition. In June 1979 when this incident occurred, plaintiffs and their three daughters, then aged 13, 11 and 3, lived next door to the Vacarezza family, which had two children, a 15-year-old daughter and a 5-year-old son, Jerome, nicknamed Jay-Jay. The two families were close friends. Plaintiffs, and particularly Mr. Eyrich, had, however, a special relationship with Jay-Jay. At the time Jay-Jay was born, Mr. Vacarezza suffered from a serious cardiac condition requiring open heart surgery and a consequently extended hospitalization and recuperation. The Eyrichs assumed Jay-Jay's care almost exclusively during the first six-months of his life. Their closeness to Jay-Jay continued, the four adults agreeing that Mr. *248 Eyrich looked upon Jay-Jay as the son he himself had never had and acted toward him as a "surrogate father."
The two families had planned to attend a local circus performance on June 7, 1979. The Vacarezzas were unable, however, to go but sent Jay-Jay along with the Eyrichs. The circus had been booked by defendant Schooley's Mountain Fire Protection Association (Schooley's) as a fund-raiser to support its volunteer fire-fighting activities. Schooley's had arranged with defendant Washington Township Board of Education for the use of school property for the performance. The circus itself was owned by defendant Robert Earl, trading as Roberts Bros. Circus (Roberts). In accordance with what appears to be a matter of custom and usage, a circus impresario, defendant William Bleisner, doing business as Wilmer Associates, had contracted with Earl for the exclusive booking rights for the circus for a designated time period. Bleisner in turn made specific bookings through his agent, defendant Carlton Young, and it was Young who apparently had negotiated with Schooley's for its sponsorship of the circus performance. The circus did not have its own wild-animal act. It appears that through Young's intervention Bleisner had contracted with defendant Conny Dam, trading as Miss Constancia Leopard and Jaguar, for the inclusion of her act, which consisted of two leopards and a jaguar.
The circus performance was held in a tent erected by Roberts in an open area adjacent to a school building. Plaintiffs with their three children and Jay-Jay arrived for the 8:00 p.m. performance and seated themselves in the bleachers erected around the circus' three rings. Dam's animal act was first on the program. Just after it started, Jay-Jay had to use the bathroom, necessitating a trip out of the tent and into the school building. The Eyrich's middle daughter, Mary Jo, volunteered to take him. As the two children reentered the tent, Dam was working with the jaguar. The two leopards were on stools. In order to return to their bleacher seats, the children were required to walk close to the center ring in which the animals were performing. As they passed, Mary Jo holding Jay-Jay's *249 hand, one of the leopards leaped off its stool, pounced on Jay-Jay, and dragged him under an empty transport cage. Mr. Eyrich, observing the disaster, rushed to the ring from his seat, pushed over the cage, and wrestled with the leopard in order to free Jay-Jay from its jaw-hold. Jay-Jay, bleeding profusely from his head and neck, was placed by other bystanders in Eyrich's arms. Eyrich, himself bruised by the leopard, ran out of the tent with the child. There were no persons trained in first-aid and no first-aid facilities at the premises. A special police officer stationed there to control traffic summoned an ambulance. Eyrich rode with Jay-Jay to the hospital where he died of exsanguination shortly after arrival.[1] Not the least of the many tragic ironies of this affair appears in the report of a physician-expert, whose opinion it was that the boy would have been saved if anyone in the immediate vicinity had had any first-aid training and therefore would have known that the fatal bleeding could have been stanched pending hospital treatment merely by pressing an index finger on the child's right occipital artery.
As to the happening of the tragedy itself, we are satisfied, based on the written report of plaintiffs' expert in circus management, that there is strong evidence of gross negligence. As to the animal act itself, it was the expert's statement that elementary safety precautions require that such an act be performed inside a steel cage surrounding the ring, that a sufficient number of animal trainers be stationed in the immediate vicinity *250 of each animal to cope with any sudden emergency, and that the animals be adequately restrained so as not to endanger the audience. Here, the only barrier between the animals and the audience was the 4 to 6 inch high wooden perimeter of the ring. Instead of experienced animal trainers, Dam had enlisted four of Schooley's volunteer firemen to stand around the ring with toy whips. They regarded themselves as the act's comic relief. In lieu of adequate restraints, the animals were attached to wooden stakes by a long chain. Finally, it appeared during the course of discovery that on the day before this tragedy one of the leopards had attacked the circus ringmaster.
The physical set-up within the tent also violated well-recognized safety standards. According to the expert, it lacked safe exits, safe aisles, and typically used warning signs. There were no adequate physical barriers between the audience seating and the performers, and the audience aisles around the performing area leading to the seats were too narrow for safety. The performers' entrance, which had been used by the children, had not been made inaccessible to the audience as it customarily is because it bears "the heaviest and most dangerous traffic of the circus." There were no security personnel or ushers to see to crowd control or to keep members of the audience, particularly children, out of zones of risk, and those zones were in no way marked with customary warning signs. It was also the expert's statement that a normal safety precaution, ignored here, is the stationing of an usher at each entrance to direct persons reentering the tent back to their seats by the safest route or even to stop their immediate reentry if danger to them would be then involved. There was also no adequate public address system for giving of effective verbal warnings to the audience. Nor, perhaps most egregiously, did the circus have its own first-aid facility or arrange for first-aid services in the event of an emergency.
*251 The psychological aftermath of the tragedy has been devastating for both plaintiffs,[2] but particularly for Mr. Eyrich. A year-and-a-half after the event, both were diagnosed as suffering from depressive neurosis, characterized as a "significant disorder for which the prognosis is poor without continued psychotherapy." It was also the psychiatrist's opinion that an appropriate course of psychotherapy would require weekly visits over a several-year period. Both, however, have been described as resistant to psychotherapy, it being the psychiatrist's opinion that "while they have rationalized this on a financial basis, dependency and control issues, as well as the wish to avoid pain, appear to be the unconscious bases for this resistance." Mrs. Eyrich, as a direct consequence of the event, was psychologically unable to continue her employment at a local nursery school and resigned from that job. She is chronically depressed and is aware of the deterioration of her marriage and her other personal relationships. The impact upon Mr. Eyrich has been even more severe, a fact attributed by the psychiatrist both to his direct involvement in the episode and to his special paternal-like relationship to the boy. He suffered from a period of excessive drinking which he eventually overcame, from "suicidal ideation," and from insomnia. He continues to be severely depressed. He also suffers recurring olfactory hallucinations in which he smells the blood which had spurted all over him. He keeps reliving the entire experience and instead of being able to mourn the child with normal grief, he became "fixed on reexperiencing the boy's loss, even to the point of beginning to identify with him and developing a fear that he himself would be attacked by a cat or other animal." Clearly then, both plaintiffs, and particularly Mr. Eyrich, sustained serious and permanent psychological damage which significantly affects their respective abilities to function normally in their daily lives and relationships.
*252 The only legal issue here is whether this psychological damage is compensable. The trial judge concluded that it was not and granted defendants' motion for summary judgment dismissing the complaint.[3] Plaintiffs appeal, relying on a variety of well-established tort doctrines pursuant to which psychological damages may be compensable. Their claim is that each of those doctrines applies to these circumstances. They argue that their claim is comprehended by (1) the so-called outrageous tort doctrine, (2) the scope of liability imposed on the harborers of wild animals, (3) the intimate familial observer doctrine of Portee v. Jaffee, 84 N.J. 88 (1980), and (4) the zone of risk doctrine of Falzone v. Busch, 45 N.J. 559 (1965). Having reviewed the record, we are satisfied that the appeal has merit.
The last two decades have witnessed in this jurisdiction significant development of the legal principles governing the compensability of negligently inflicted emotional distress. Prior to the Supreme Court's decision in Falzone v. Busch, supra, emotional distress, even if resulting in physical harm, was not generally actionable unless it was accompanied by a physical impact. See Ward v. West Jersey & Seashore R.R. Co., 65 N.J.L. 383 (Sup.Ct. 1900). That rule was restated by Greenberg v. Stanley, 51 N.J. Super. 90, 106 (App.Div. 1958), modified on other grounds 30 N.J. 485 (1959), as follows:
As New Jersey does not allow a cause of action where there has been no physical impact upon the plaintiff, even where his fear is for his own safety ..., the infliction of anguish by the negligent injury of another, without physical trauma to the plaintiff, would be equally unremediable. But where the defendant's negligence occasions some personal physical injury to the plaintiff, no matter how slight, the plaintiff may recover for fright, shock and mental agitation as part of his damages.
It was not until Falzone v. Busch, supra, that the prerequisite of accompanying physical injury was abandoned. Recognizing that "the many eminent legal scholars who have considered the rule denying recovery in the absence of impact are virtually *253 unanimous in condemning it as unjust and contrary to experience and logic," Id. at 567-568, Falzone overruled Ward and, in the context of the facts before it, held that where a plaintiff is placed in reasonable fear of his own immediate safety and that fear results in substantial bodily illness, "the injured person may recover if such bodily injury or sickness would be regarded as proper elements of damage had they occurred as a consequence of direct physical injury rather than fright." Id. at 569. Falzone was subsequently qualified by Caputzal v. The Lindsay Co., 48 N.J. 69, 76 (1966), which made clear the applicability of a foreseeability criterion to negligently caused emotional stress, holding that "liability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted, thus then bringing the plaintiff within the `zone of risk.'"
Thus, until the decision in Portee v. Jaffee, 84 N.J. 88 (1980), emotional distress was compensable only if attendant upon an actual physical impact or resulting from the fear of an imminent physical impact. Portee extended compensability to the emotional stress suffered by a bystander who witnesses the negligently inflicted physical injury or death of another even if he himself is not in any physical danger. Compensability in these circumstances requires, however, that three conditions be satisfied. First, the physical injury or death of the victim must be actually perceived by the bystander at the scene of the accident. Second, the bystander and victim must be bound by a marital or intimate familial relationship. And third, the resulting emotional distress of the bystander must be substantial.
With the holding in Portee, the law in this jurisdiction closely follows the Restatement view. Thus, as provided by 2 Restatement, Torts 2d, § 436A at 461 (1965), emotional disturbance, to be compensable at all, must be sufficiently substantial to result in physical illness or serious psychological sequelae. As explained by Comment c. at 462:

*254 The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.
Emotional stress of a nature and quality potentially qualifying for compensability is moreover only compensable, according to Section 436(2), "[i]f the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance." [Emphasis supplied]. If that condition is met, Section 436(2) states that "the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability." Finally, Section 436(3) makes clear that the Section 436(2) rule applies "where the bodily harm to the other results from his shock or fright at harm or peril to a member of his immediate family occurring in his presence." Thus, Falzone v. Busch adopts Section 436(2) and Portee adopts Section 436(3). See also 2 Restatement, Torts 2d, § 313.[4]
*255 The question before us is whether under these principles the psychological harm sustained by either Mr. Eyrich or Mrs. Eyrich or both as a result of the leopard's attack on their neighbor's child and the child's consequent death is compensable. We assume for purposes of this determination that the attack resulted from the negligence of one or more of these defendants. We address first Mr. Eyrich's cause of action.
We note at the outset, defendants' attempt to characterize Mr. Eyrich's emotional distress simply as grief over the death of the child, exacerbated by having witnessed the fatal accident. They argue therefore that his cause of action is precluded by Portee v. Jaffee, which limits compensability in such circumstances to a witness who is related to the victim by intimate familial ties. Since Mr. Eyrich was not the boy's father and was not otherwise related to him by a family bond, his cause of action, they contend, must fail. Plaintiff's argument is that his unique and special relationship with the boy, his "surrogate father" status, should be regarded as fulfilling the relationship condition of Portee.
We do not address this argument because we are persuaded that defendants' liability to Mr. Eyrich does not at all depend on his alleged bystander role. His role was not that of a passive shocked witness but rather that of a rescuer, making a heroic *256 effort to save the child from a negligently created peril. It was he who rushed to the child's aid, pushed over the cage under which the leopard had dragged the boy, wrestled with the leopard to force it to release the child and then ran out with the child to seek medical assistance. In doing so, he came poignantly close to saving the child, whose life would have been spared if at that point there had been a trained first-aid person in attendance at the circus. Also in so doing, he subjected himself to the risk of serious physical injury even though his actual physical injury was minor.
It is well settled that where a danger has been negligently created, particularly a danger to a child, the intervention of a rescuer is reasonably foreseeable and, consequently, the tortfeasor may be liable to the rescuer based on his negligence which imperiled the person requiring rescue. See Harrison v. Middlesex Water Co., 158 N.J. Super. 368, 376 (App.Div. 1978), reversed on other grounds, 80 N.J. 391 (1979). Demetro v. Penna. R.R., 90 N.J. Super. 308 (App.Div. 1966). And see 2 Restatement, Torts 2d, § 472 at 521 (1965); 2 Harper & James, Law of Torts, § 18.2 at 1018, 1020 (1956). We are satisfied that this record would support the finding that plaintiff's rescue attempt was foreseeable. Therefore, by negligently placing the child in danger of the leopard's attack, defendants also created, in the phraseology of Section 436(2) of the Restatement, "an unreasonable risk of causing harm to another otherwise than by subjecting him to fright, shock or other similar and immediate emotional disturbance."
It is defendants' contention that despite plaintiff's physical involvement in the episode as a whole, and even if they had been culpable in creating the condition resulting in that involvement, plaintiff's ensuing psychological harm is nevertheless not compensable because it was not caused by fear for his own safety. Defendants' view of the scope of compensable psychological harm is, however, too narrow. We are satisfied that once a plaintiff has been negligently placed within the area of *257 physical risk and has actually sustained a physical impact, his cause of action for emotional distress is not limited to the psychological sequelae of fear for himself but rather comprehends all of the psychological sequelae which as a matter of reasonable foreseeability result from the episode as a whole.
In urging that it is only the emotional consequences of fear for one's own safety which are compensable when one is placed in danger of or actually suffers physical harm, defendants rely on Falzone v. Busch, supra. There plaintiff's wife was seated in an automobile from which her husband had just exited. While he was standing in a field close to where the car was parked, he was struck and injured by another automobile which had veered across the highway and nearly hit the car plaintiff was sitting in as well. The Court, however, noted that plaintiff's wife had made no allegation that "her fear arose from apprehension of harm to her husband." Falzone, 45 N.J. at 561. It was only the consequences of her fear for her own safety for which she sought recovery. It is therefore clear that Falzone did not purport to consider the full scope of compensable emotional distress resultant from one's presence in the zone of impact.
More to the point, in our view, is Greenberg v. Stanley, supra. The fatal accident which was the subject of that action occurred when the plaintiff-wife was wheeling her five-month-old daughter in her carriage. An automobile negligently driven by defendant mounted the curb, striking plaintiff and the carriage. Plaintiff was injured and the baby was killed. Defendant there argued to this court that the damages awarded by the jury to plaintiff were excessive in that they included "compensation for psychological damages attributable to shock and grief over the loss of her baby and * * * such elements of damages were not recoverable." Greenberg, 51 N.J. at 105. The court agreed with the proposition that those damages standing alone were not recoverable but concluded nevertheless that this was "not a case of emotional disturbance resulting from merely witnessing the fatal injury of a child." Ibid. The psychiatric testimony was to the effect that while the death of the child was one of the *258 sources of plaintiff's ensuing psychoneurosis, the neurosis was actually a product of "the accident, the injury, the whole constellation. It wasn't just the death of the child." Ibid. Based on this testimony, the jury's damages verdict was sustained. Judge Conford, writing for the Court, concluded that
... [Plaintiff's] entire physical and mental condition was directly attributable to the accident, that her disabilities constituted an integral situation in which the sudden, unexpected and severe physical trauma was inextricably intertwined with the emotional shock over the simultaneous fatal injury to the infant and that damages were recoverable for her entire resulting injuries and disturbances. [51 N.J. Super. at 105-106]
We note first that the Restatement view as expressed in Section 436(2), above quoted, does not limit compensability for emotional harm to harm resulting from fright for one's own safety. That section expressly refers to "fright or other emotional disturbance." Nevertheless, even if grief over the death of another suffered by a plaintiff in the zone of physical danger were not compensable standing alone, we are satisfied that the rationale of Greenberg v. Stanley applies here.
While plaintiff's grief over the death of Jay-Jay is certainly a significant component of his psychological problems, it is obvious that it is not the only component and that his psychological problems would have been very different had he not himself been involved in the circumstances resulting in the boy's death. It defies the most elementary understanding of the way trauma affects the human mind to assert that Eyrich's physical contact with the leopard, his seizing of the wounded child from its mouth and the ultimate failure of his attempted rescue did not constitute an integral and significant part of the entire episode which caused his mental disturbance. The psychiatrist's description of plaintiff's torment in reliving the entire event, his olfactory hallucinations, and his developing cat phobia strongly reinforces the conclusion that the cause of plaintiff's neuropsychiatric condition far transcends simple grief but is rather the product of and extricably intertwined with his own physical participation in the event. To the extent the jury will *259 ultimately accept this view of the proofs, there is no question that plaintiff's psychological damage is compensable.
Mrs. Eyrich's situation is obviously and significantly different. She was a bystander, not a participant, and we are satisfied that the harm she sustained would be compensable only by an extension of Portee. Clearly she meets two of the conditions: severe emotional stress and observation at the scene of the fatal accident. She does not meet the third because she is not bound to the child by intimate family ties. It is certainly arguable that this condition should be fulfillable by one's status as the child's temporary caretaker or custodian. Portee is predicated on the appreciation that "no loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure. The law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed." Portee, 84 N.J. at 97. In our view when a person who has been entrusted with the temporary care of a child witnesses the child's accidental death or critical injury and knows he cannot return the child safely to his parents, his remorse, no matter how blameless he may have been, necessarily imposes an excruciating and wrenching burden of guilt. The psychological impact of that burden is no less foreseeable than the parents' grief, and freedom from that burden represents no less a protectible interest. We are, however, an intermediate appellate court bound by the decisions of our highest court. We are consequently of the view that since the compensability of Mrs. Eyrich's harm would involve a clear departure from the strict limitations of Portee, that extension of the Portee doctrine should come not from us but from the Supreme Court.
Since we are constrained to affirm on general negligence principles the summary judgment dismissing Mrs. Eyrich's complaint, we must address her alternate theories based on the *260 outrageous tort doctrine and the strict liability of harborers of wild animals.
As to the first of these, plaintiff relies on 1 Restatement, Torts 2d, § 46 (1965), stating the view that "[o]ne who by extreme and outrageous conduct causes severe emotional distress to another is subject to liability for such emotional distress. * * *" As explained by Comment d. at 72-73:
The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."
And see, adopting the Restatement view, Hume v. Bayer, 178 N.J. Super. 310 (Law Div. 1981). See also Calliari v. Sugar, 180 N.J. Super. 423 (Ch.Div. 1980). Although there may have been gross negligence here, we are nevertheless constrained to agree with the trial judge's perception that the circumstances of this case do not bespeak the kind of specifically directed outrageous conduct contemplated by this doctrine.
We are also satisfied that Mrs. Eyrich's cause of action cannot be predicated on the general liability of harborers of wild animals. It is her theory that since harborers of wild animals are strictly liable for injury they inflict, her psychological injuries are compensable as well. But the scope of liability is quite a different matter from the scope of damages and a determination of liability alone does not determine the nature of the damages which are compensable. The Restatement view is that while the reasonable fear of an attack on oneself by a wild animal is compensable if it causes an emotional disturbance of a character likely to result in physical harm, nevertheless the customary rules governing compensability for psychological damage are *261 applicable in this context as well. See 3 Restatement, Torts 2d, § 507, Comment g. at 13 (1977).
We conclude therefore that while Mr. Eyrich's complaint stated a viable cause of action, Mrs. Eyrich's did not. We affirm the summary judgment insofar as it dismisses her complaint and reverse insofar as it dismisses his complaint. We remand to the trial court for further proceedings. In this regard, we note that some of the defendants have challenged the cause of action not only on this basis but also by way of various affirmative defenses to the allegation of their respective liability. These issues were not, however, considered by the trial court, and we express no views with respect thereto. All defendants remain free to prosecute their respective defenses by further motion or otherwise.
The summary judgment motion is affirmed in part and reversed in part, and we remand for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] We must here digress to point out that with surprising disingenuousness requiring our disapproval both respondent briefs, in their respective statements of fact, completely omit any mention whatsoever of Mr. Eyrich's personal and direct involvement in the tragic events from the time of the leopard's attack. Both briefs merely say that several "bystanders," who are not identified, rescued the child from the leopard's jaws and that the child was then rushed out of the tent to await the arrival of an ambulance summoned by the special police officer. We cannot conceive of the respondents' failure to appreciate the critical significance of Eyrich's rescue efforts.
[2] It should be noted that the complaint originally joined as a plaintiff Mrs. Eyrich as guardian ad litem for Mary-Jo. That claim was settled and is not before us.
[3] All defendants joined in the motion except defendant Dam against whom a default had been entered.
[4] Section 313, entitled "Emotional Stress Unintended" states that:

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
(a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and
(b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.
(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.
As explained by Comment d. at 114-115:
The rule stated in Subsection (1) applies only where the negligent conduct of the actor threatens the other with emotional distress likely to result in bodily harm because of the other's fright, shock, or other emotional disturbance, arising out of fear for his own safety, or the invasion of his own interests. It has no application where the emotional distress arises solely because of harm or peril to a third person, and the negligence of the actor has not threatened the plaintiff with bodily harm in any other way.
* * * * * * * *
As to the rule to be applied where the other is so threatened with bodily harm in another manner, and instead suffers emotional distress at the peril or harm of a third person, which results in bodily harm to the other, see § 436.