**Errol DOBELLE and Sydelle
Dobelle, Plaintiffs,**

v.

**NATIONAL RAILROAD PASSENGER
CORPORATION, a/k/a
Amtrak, Defendant.**

**No. 80 Civ. 4763 (PKL).**

United States District Court,
S.D. New York.

Feb. 26, 1986.

Lipsig, Sullivan & Liapakis, P.C., New York City, for plaintiffs; Robert G. Sullivan, Marshall M. Kolba, Hugh M. Turk, of counsel.

Speiser & Krause, P.C., New York City, for defendant; Rudolph V. Pino, Jr., Catherine V. Granito, of counsel.

## OPINION

LEISURE, District Judge:

This matter is before the Court on defendant's motion, pursuant to Fed.R.Civ.P. 12(b)(6) and 56, for an order dismissing the action on the grounds that there are no genuine issues of material fact to be tried and that defendant is entitled to judgment as a matter of law. Plaintiffs Errol and Sydelle Dobelle seek compensatory and punitive damages for physical and psychological injuries allegedly sustained as a result of Errol Dobelle ("Dobelle") having witnessed severe and fatal injuries to other passengers at the scene of a train wreck while he was a passenger on defendant's train. Defendant claims that, because plaintiff's psychological problems were not proximately caused by the accident, the complaint in this action should be dismissed.

Plaintiffs are citizens of Pennsylvania. Defendant, National Railroad Passenger Corporation, a/k/a Amtrak, is a corporation established by an Act of Congress and is deemed to be a citizen of and to have its principal place of business in the District of Columbia. 45 U.S.C. § 546(m). Accordingly, jurisdiction over this matter exists by reason of the diversity of citizenship of the parties. 28 U.S.C. § 1332.

## FACTUAL BACKGROUND

Based upon the affidavits and legal memoranda submitted by the parties, the relevant facts appear to be as follows.

This action arises from an accident which occurred on July 9, 1980, when a fifteen-foot section of steel rail, carried by an Amtrak work train, struck and penetrated a passenger train. On March 30, 1980, a similar incident occurred when an unsecured buffer rail[1] fell between the moving cars of an Amtrak work train causing the train's derailment.

Following the March 30 accident, Amtrak's Assistant Track Supervisor for the Northeast Corridor directed the Philadelphia Engineer of Rail to circulate to all Division Engineers an internal memorandum prohibiting workers from leaving unsecured buffer rails on trains after continuously welded rails ("CWR") had been unloaded. In addition, no unloaded train was to be permitted to be moved until it had been inspected by a track engineer, an Amtrak official, to determine that no unse-

---

1. At the time of the accident, Amtrak used pieces of steel, from six to thirty feet in length, known as buffer rails, for the purpose of attaching the ends of continuously welded rails ("CWR") being transported on flat-bed cars to the rail racks on the rear of the trains. CWR are pieces of rail welded together to form lengthier rail used for track replacement. CWR now are cut in uniform lengths, apparently obviating the need to use buffer rails.

cured equipment was lying on it. Amtrak took no further actions. The memorandum was not sent to Amtrak's Operating Department or Equipment Department, although these departments were supposed to coordinate their activities with the Engineer of Rails during CWR unloading.

On July 8–9, 1980, a CWR work train was unloading rail between Morris and Grundy, Pennsylvania. The work train consisted of thirty-three cars, twenty-eight of which were flat cars specially equipped to transport CWR. An inexperienced track supervisor was assigned to supervise the unloading of the CWR. After the CWR had been unloaded, the train, which had not been inspected, headed for the Hudson train yard in New Jersey. The members of the work crew, who were unaware of the memorandum circulated to all Division Engineers, did not secure the loose material on the train, nor did they secure the buffer rails lying on the beds of the rear cars. Contrary to standard Amtrak operating procedures, the train was not equipped with a rear cabin, which would have allowed some of the crew members to observe the rail train while it was in operation, as a precaution in the event anything broke loose. Instead, all of the train's crew members rode in the head two cars of the train.

At approximately 4:00 p.m. on July 9, 1980, the work train passed a Metroliner. The Metroliner's conductor noticed the loose material on the work train and informed the Midway, New Jersey station. The Midway operator relayed this information to the county station operator, who observed that the work train activated the dragging equipment detector, an indication that material was trailing from the train at track level.

The county operator radioed the work train. Although the train's radio was not operating properly, the conducter understood enough to prompt him to stop the train. He "walked" the train and found several rail joint bars hanging over the sides of the rear cars. He pushed these bars back onto the train and attempted to

secure them. No attempt was made, however, to secure the buffer rails, which were lying loose on the flat bed cars. The train then continued to the train yard.

Dobelle left New York City's Pennsylvania Station at 6:00 p.m. on a six-car Amtrak passenger train bound for Philadelphia. At 6:40 p.m., this train passed through Linden, New Jersey, travelling at sixty miles per hour. At the same time the work train was proceeding eastbound on the parallel track. As the trains passed each other, a fifteen-foot buffer rail, weighing 755 pounds, struck the passenger train, sliced through the midsection of the first car, dismembered and killed one passenger and critically injured seventeen others. Plaintiff's deposition testimony demonstrates that he saw the rail coming right at him and that he feared for his personal safety.

> I saw a projectile come through the bottom of the car, approximately ... 18 inches from the floor.
>
> . . . .
>
> Three feet from me.
>
> . . . .
>
> It was aiming right at me.
>
> . . . .
>
> When I found out that I was still in one piece, and that I wasn't hit, I just started looking to see if everything was there and I wasn't hit but the gentleman to my left was no longer there.
>
> . . . .
>
> All I know, he was to my left, when the projectile came through, it caught a girl's leg and then I saw a body go flying up and back and then after checking myself—I thought I was injured at first because I had some splattering of blood on me. . . .

He stated that, after he got up to see if his legs were all right "I just couldn't believe what I saw." Plaintiff also stated that, when he saw the projectile coming, he stopped breathing and froze.

After the accident, plaintiff assisted the rescue workers. He recalls one woman who was on the "bottom of the pile" of bodies. "[H]er face looked like ... she

was beat up with baseball bats all over." Plaintiff believes that if he had not turned her over, she would have drowned in someone else's blood.

Plaintiff was taken to Rahway Hospital. The only physical injury he complained of was some pain in his lower back. The doctor noted, however, that Dobelle suffered from "acute anxiety." Although he did not feel well, he was not admitted to the hospital and was permitted to return home. The day after the accident, Dobelle was examined by his personal physician because he "just didn't feel good." He discussed with the doctor his depression from having seen the injuries to the other passengers at the scene of the accident.

Since the accident, plaintiff has entered hospitals three times seeking treatment for acute depression. The medical reports describe an emotionally devastated man who cannot cope with the memory of the accident. When plaintiff was admitted to Eugenia Hospital on June 4, 1982, he was suffering from depression. He had gained weight, begun drinking and had lost interest in his family and life in general. He was subject to anxiety attacks and he could not sleep. He was discharged on June 12, 1982, and placed under out-patient care. One year later, when he was admitted to Huntington Hospital, it was noted that "his sleep disturbance, lack of interest in usual activities, poor concentration, crying spells and feelings of depression and irritability had increased markedly so inpatient care was arranged."

A psychological evaluation dated March 23, 1985 indicates that plaintiff was mentally and emotionally disturbed. "There is ... no doubt that the indicators of disturbance are consistent with the hypothesis that he was traumatized by the gory scene he witnessed following the train collision and that, nearly five years later, some interaction of his personality and the trauma scene is precluding him from putting the incident behind him and proceeding with a normal life." These medical reports indicate that plaintiff's condition has not improved in the five and one-half years since

the accident. Two months after the accident, he was fired from his position as a vice president of a multi-million dollar company. Since then he has not been able to hold a steady job.

## LEGAL DISCUSSION

Amtrak does not contest liability for compensatory damages proved to have been proximately caused by the accident. But Amtrak claims that because Dobelle was not physically injured by the accident and was not related to any of the passengers whose injuries he allegedly witnessed, his psychological problems were not proximately caused by the accident.

In diversity actions such as this, the federal court is required to follow the choice-of-law rules of the forum state in determining the substantive law to be applied. *Klaxon Co. v. Stentor Electrical Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Krauss v. Manhattan Life Insurance Co. of New York*, 643 F.2d 98, 100 (2d Cir.1981). Plaintiffs have argued that the issue of damages should be determined in accordance with the laws of Pennsylvania, the state of plaintiffs' domicile. Applying a "loss-allocating" rather than a "conduct-regulating" rule, the New York Court of Appeals recently held in *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985), that the law of a plaintiff's domicile should determine whether the plaintiff is entitled to an award of compensatory damages. Defendant has agreed that Pennsylvania law applies to the issue of compensatory damages, although it contends, based on the facts of this case, that there is no real conflict between the laws of New Jersey, Pennsylvania or New York regarding this issue. Under these circumstances, the Court does not feel obliged to undertake an investigation to determine specifically whether there is any difference in the law of these jurisdictions. *Cf. Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir.1986) (Friendly, J.) (reaching this conclusion where plaintiff did not concede which state's law would apply, but the par-

ties cited cases of only one jurisdiction). Defendant contends that a real conflict of laws exists with respect to the issue of punitive damages and argues that the law of New Jersey, the place of the accident, governs the issue of punitive damages. This opinion will first address the issue of whether plaintiff has stated a cause of action under Pennsylvania law and, if so, then determine whether Pennsylvania or New Jersey law applies to the issue of punitive damages.

*Compensatory Damages*

██ In a diversity case such as this, in the absence of a Pennsylvania Supreme Court decision directly on point, the federal court must predict how that court would decide the issues presented. *McGowan v. University of Scranton,* 759 F.2d 287, 291 (3d Cir.1985). This process often involves "a substantial amount of conjecture." *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273 (3d Cir.1985).

> In attempting to forecast state law, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.

*McGowan,* 759 F.2d at 291 (quotation omitted). Decisions of intermediate appellate courts are indicia of how the state's highest court might decide the issue, *id.,* but the court must not apply "state decisional law to the case at hand in a narrow and mechanical fashion." *Medvecz v. Choi,* 569 F.2d 1221, 1226 n. 14 (3d Cir.1977). The federal court should examine relevant state authorities "with an eye toward the broad policies and principles that underlie and are given concrete embodiment in the cases." *Id.* Finally, when the law of the state does not address the precise issue, it is the court's task to reach the correct result by looking to decisions of other jurisdictions. *Metz v. United Technologies Corp.,* 754 F.2d 63, 66 (2d Cir.1985).

Defendant contends that there are three reasons why no material questions of fact remain in this case. First, plaintiff was not physically injured as a result of the accident and therefore is not entitled to recover for emotional distress caused by the accident. This argument fails, however, to take into account the "zone of danger" rule followed in Pennsylvania. Before 1970, Pennsylvania followed the "impact rule" that precluded recovery for negligently inflicted emotional distress in the absence of any physical impact. In *Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970), the Pennsylvania Supreme Court abandoned this "impact rule" and adopted the "zone of danger" test. In *Niederman,* a father was walking with his son when an out-of-control automobile jumped onto the sidewalk and struck the son. The father was not hit, but suffered a heart attack. His complaint for emotional disturbance was initially dismissed. The claim was reinstated by the Pennsylvania Supreme Court, which held that because the father was in the zone of danger he could recover for the injuries he suffered. The Court held:

> We today choose to abandon the requirement of a physical impact as a precondition to recovery for damages proximately caused by the tort in only those cases like the one before us where the plaintiff was in personal danger of physical impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact. Since appellant's complaint alleges facts which if proven will establish that the negligent force was aimed at him and put him in personal danger of physical impact, and that he actually did fear the force, this case must proceed to trial.

436 Pa. at 413, 261 A.2d at 90. Although *Niederman* involved a concurrent injury to plaintiff's son, the fact that a close relative was involved played no part in the Court's determination that plaintiff could recover for the injuries he suffered.

The *Niederman* court saw fit to discard the impact rule because it was satisfied that advancements in medical science no longer justified the belief that proof of causation between claimed damages and

alleged fright was too speculative. "[E]ven if we assume *arguendo* that a great deal of difficulty still remains in establishing the causal connection, this still does not represent sufficient reason to deny appellant an *opportunity* to prove his case to a jury." 436 Pa. at 408, 261 A.2d at 87 (emphasis in original).

The court considered the Restatement (Second) of Torts § 436(2) (1965) to be in harmony with its approach. 436 Pa. at 404, 261 A.2d at 85. Section 436(2) provides:

> If the actor's conduct is negligent as creating an unreasonable risk of causing bodily harm to another otherwise than by subjecting him to fright, shock, or other similar and immediate emotional disturbance, the fact that such harm results solely from the internal operation of fright or other emotional disturbance does not protect the actor from liability.

Comment b to § 436(2) states that recovery is available when someone is "so frightened or shocked as to miscarry or otherwise to be made ill." Comment c provides that the "emotional disturbance must be the immediate result of the actor's negligent conduct." Comment c then states:

> If the emotional disturbance is shock, the shock must be due to the [plaintiff's] witnessing the [defendant's] negligence or its *immediate consequences*. Subsequent brooding over the [defendant's] misconduct or the danger in which it had put the [plaintiff] is not enough to make the negligent [defendant] liable for an illness so brought on. (Emphasis added.)

Applying these principles to the facts of this case, material factual issues exist as to whether Dobelle's emotional disturbance is the immediate result of defendant's negligence or its "immediate consequences," or whether it amounts to mere brooding over the accident and the danger in which it had placed Dobelle.

The scope of the *Niederman* "zone of danger" rule was further articulated by the Pennsylvania Supreme Court in the case of *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979), when an exception to the "zone of danger" theory was created. Two sisters were standing by the mail box in front of their house. While their mother was watching from the house, an automobile struck and killed one sister and narrowly missed the other. The surviving sister and the mother sued for emotional harm resulting from observing the accident. Defendant's motion to dismiss for failure to state a claim was denied as to the sister, but granted as to the mother. Both decisions were affirmed on appeal to the Superior Court. *Sinn v. Burd*, 253 Pa.Super. 627, 384 A.2d 1003 (1978). Only the decision dismissing the mother's claim was appealed to the Supreme Court.

The *Sinn* court, in a 3–2 majority opinion by Justice Nix, reversed the decisions of the lower courts, holding that under the circumstances presented, it would be unreasonable for the zone of danger requirement to preclude a recovery. 404 A.2d at 677. The "zone of danger" theory was described in the following terms:

> "[W]here the plaintiff was in danger of physical impact because of the direction of a negligent force against him and where plaintiff actually did fear the physical impact," *Niederman* [436 Pa.] at 413, 261 A.2d at 90, he could recover for the shock, mental pain, and physical injuries *attendant to the negligent incident* even though he was not struck by the negligent force.

404 A.2d at 676 (emphasis added). Justice Nix determined that since the mother was near the scene of the accident, experienced shock or emotional trauma from observing the accident and was closely related to the victim, her "injuries were of a nature reasonably foreseeable under the circumstances alleged." 404 A.2d at 686. Once again, the seriousness of plaintiff's injury and the responsiveness of the judicial process to the need for justice dictated " 'that appellant be afforded a *chance* to present [her] case to a jury and perhaps be compensated for the injury [she] has incurred.' " *Id.*, quoting *Niederman*, 436 Pa. at 404, 261 A.2d at 85 (emphasis in original).

■ The Pennsylvania Supreme Court decisions in *Niederman* and *Sinn* demon-

strate that Dobelle need not have been injured or impacted as a direct result of the accident in order to recover damages caused by defendant's negligence. Dobelle has satisfied the *Niederman* requirements since he was in the zone of danger and actually feared for his personal safety. This entitles him to recover for any bodily harm that may have resulted from fright that he experienced as a consequence of the accident. At the very least, a material question of fact is presented as to whether or not Dobelle was in the zone of danger.

Defendant next argues that even if it is assumed that plaintiff was in the zone of danger at the time of the accident, he is entitled to recover damages only for those injuries sustained as a result of any impact he may have experienced or injuries proved to have been proximately caused as a result of fear of imminent harm to his person. Defendant contends that Dobelle's trauma is the result of witnessing other passengers being physically injured and killed in the accident and not as a result of any fright arising out of concern for his own person.

Defendant claims that a plaintiff may recover for mental distress caused by fright due to injury to a third person only in cases where the plaintiff is a close relative of the injured person. *See, e.g., Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979). Since Dobelle was not related to any of the passengers who were injured or killed, any emotional trauma caused by seeing them injured, either during the course of the accident or in its immediate aftermath, is not compensable.

■ Defendant correctly states a rule of law, but misapplies it to the facts of this case. The requirement of familial relation to the victim arises only in cases "[w]here the mental disturbance and its consequences are not caused by *any* fear for the plaintiff's own safety, but by distress at witnessing some peril to another person." *Prosser & Keeton on the Law of Torts*

("*Prosser*") § 54 at 365 (5th ed. 1984) (emphasis added). *Accord* Restatement (Second) of Torts § 313(2) (1965) (no liability for unintended infliction of mental distress where illness or bodily harm is "caused by emotional distress arising *solely* from harm or peril to a third person") (emphasis added); *id.* § 436(3) comment f (no liability where shock or fright due to fear for unrelated third persons and "not due to *any* fear for his own safety") (emphasis added). So long as a plaintiff satisfies the *Niederman* requirements that he was placed in personal danger of physical impact and that he actually feared such bodily harm, liability exists for "fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff." *Potere v. City of Philadelphia*, 380 Pa. 581, 589, 112 A.2d 100, 104 (1955); *Niederman*, 436 Pa. at 405, 261 A.2d at 86.[2]

■ The basis for the family member requirement in bystander cases is the concern of burdening defendants with responsibility for unforeseeable injuries. *Sinn*, 404 A.2d at 678; *Prosser* § 54 at 366. A defendant reasonably could not anticipate any harm to a mere bystander and therefore owed him no duty of care. *Id.*, at 365. "A plaintiff may only sue in his own right for a wrong personal to him, and not as the vicarious beneficiary of a breach of duty to another." *Bowman v. Sears, Roebuck & Co.*, 245 Pa.Super. 530, 369 A.2d 754, 757 (1976). A plaintiff in the zone of danger is already threatened with physical injury as a result of a defendant's negligence. Once that initial breach of duty is established, the issue then "becomes merely a matter of the unexpected manner in which the foreseeable harm has occurred." *Prosser* § 54 at 365. *See also* Restatement (Second) of Torts § 436 comment h. Defendant's liability for emotional distress upon breach of that duty "is not limited to the psychological sequelae of [plaintiff's] fear for himself but rather comprehends all of the psycho-

---

**2.** Although it is a pre-zone of danger case, this aspect of the *Potere* decision applies herein since *Niederman* did not alter the rules of proxi- mate cause that are to be applied once a breach of duty is established.

logical sequelae which as a matter of reasonable foreseeability result from the episode as a whole." *Eyrich v. Dam*, 193 N.J.Super. 244, 473 A.2d 539, 546 (App. Div.), *certif. denied*, 97 N.J. 583, 483 A.2d 127 (1984); *cf. Bowman*, 369 A.2d at 757 (a plaintiff not within the zone of danger cannot recover "for mental shock and injury brought about by the sight of harm or peril to another person within the danger zone"). Stated differently, defendant is responsible for "those emotional injuries that were foreseeable or that could have been reasonably anticipated to result from the negligent act." *Chappetta v. Bowman Transportation, Inc.*, 415 So.2d 1019, 1023 (La. Ct.App.1982). Whether plaintiff's emotional distress was caused by fear of imminent personal bodily harm, fear for the safety of third persons only, or both, and whether such stress reasonably could have been anticipated to result from defendant's negligent act, are questions of fact to be decided by the jury.

*Bowman v. Sears, Roebuck & Co.*, 245 Pa.Super. 530, 369 A.2d 754 (1976), presents a fact pattern analogous in some respects to the instant case. Mrs. Bowman and her two adult daughters were shopping in a Sears store when she saw five men employed by defendant accost and forcibly remove her daughters from the shopping area. The daughters were detained for thirty minutes. Upon their return, they found their mother in a state of great anxiety which led to her suffering a heart attack. The complaint sought damages for injury resulting both from her own fear of physical attack by the same employees but also resulting from the shock of seeing the assault upon her daughters. The Superior Court found that the mother had pleaded a claim within the zone of danger and presented a triable question of fact for the jury. 369 A.2d at 757. As in *Niederman*, the fact of familial relation did not play a part in the court's decision.

Finally, defendant argues that the emotional trauma which plaintiff claims he has suffered is not, as a matter of law, a medically diagnosable physical injury. The weight of relevant legal authority is to the contrary. In *Zelinsky v. Chimics*, 196 Pa. Super. 312, 175 A.2d 351 (1961), plaintiff's automobile was travelling at thirty miles per hour when it was jostled by another automobile. Plaintiff sustained no physical injuries but there was evidence that immediately after the accident plaintiff was "well shook up." 175 A.2d at 352. Two months after the accident, plaintiff quit his job because he could not concentrate and was worried about his family. He was admitted to the hospital and received shock treatments. The trial court sustained defendant's motion to dismiss all claims, except the automobile damage claim. The Superior Court reversed, holding that the issue of whether the collision was a cause of plaintiff's "depressive reaction" should have been submitted to the jury. 175 A.2d at 354. "[R]ecovery for such injuries and suffering is a matter for the jury's determination." *Id. Accord Potere v. City of Philadelphia*, 380 Pa. 581, 112 A.2d 100, 104 (1955) (evidence of shock to the nervous system, diagnosed as "anxiety neurosis," properly submitted to the jury). This is consistent with the view expressed by Comment c to § 436A of the Restatement (Second) of Torts which, in pertinent part, provides:

> [L]ong continued nausea or headaches may amount to illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.

*See also Daley v. LaCroix*, 384 Mich. 4, 179 N.W.2d 390, 396 (1970) (sudden weight loss, inability to perform household duties, extreme nervousness and irritability are "facts from which a jury could find or infer a compensable physical injury"); *Toms v. McConnell*, 45 Mich.App. 647, 207 N.W.2d 140, 145 (1973) (withdrawal from normal socialization and continued depressed state); *Petition of United States*, 418 F.2d 264, 269 (1st Cir.1969) (a "nervous disorder

is a 'physical injury' sufficient to support an action for damages for negligence"). *See generally Leong v. Takasaki,* 55 Hawaii 398, 520 P.2d 758, 766–67 (1974); Comment, *Negligently Inflicted Mental Distress: The Case For An Independent Tort,* 59 Geo.L.J. 1237 (1971); Note, *Negligence and the Infliction of Emotional Harm: A Reappraisal of the Nervous Shock Cases,* 35 U.Chi.L.Rev. 512 (1968). Once again, whether Dobelle's psychological history since the accident constitutes "bodily harm or other compensable damage" is a material question of fact for the jury.

The Court is mindful that as a court sitting in diversity it is bound to apply the law of Pennsylvania as it would be applied by the Pennsylvania courts in this case. Since there is no decision of the Pennsylvania Supreme Court directly on point, this Court has had to engage in a "substantial amount of conjecture." *Wisniewski v. Johns-Manville Corp.,* 759 F.2d 271, 273 (3d Cir.1985); *cf. Saloomey v. Jeppesen & Co.,* 707 F.2d 671, 674 (2d Cir.1983); *Joy v. North,* 692 F.2d 880, 884–85 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). Nevertheless, it is this Court's determination that denying defendant's motion is consistent with the decisions of the Pennsylvania Supreme Court in *Niederman* and *Sinn.*

> [T]he gravity of [plaintiff's] injury and the inherent humanitarianism of our judicial process and its responsiveness to the current needs of justice dictate that [plaintiff] be afforded a *chance* to present his case to a jury and perhaps be compensated for the injury he has incurred.

*Niederman,* 436 Pa. at 404, 261 A.2d at 85 (emphasis in original); *Sinn,* 404 A.2d at 686. Accordingly, defendant's motion for summary judgment dismissing the complaint is denied.

*Punitive Damages* [3]

■ While the parties agree that Pennsylvania law should apply to the issue of compensatory damages, defendant argues that New Jersey law should apply to the issue of punitive damages. A significant conflict of laws does not exist with regard to the legal standard to be applied when the assessment of punitive damages is at issue, since both Pennsylvania and New Jersey appear to adhere to the standard set forth by the Restatement (Second) of Torts § 908 (1979).[4] *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747 (1984); *Leimgruber v. Claridge Associates,* 73 N.J. 450, 375 A.2d 652, 655–57 (1977); *Berg v. Reaction Motors Division,* 37 N.J. 396, 414, 181 A.2d 487, 496 (1962). More specifically, both states recognize that punitive damages may properly be awarded if it is proved "that there has been a deliberate act or ommission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Berg,* 37 N.J. at 414, 181 A.2d at 496. *Accord Feld,* 485 A.2d at 747–48. This is the view set forth in § 908(2) of the Restatement. *See* Note 4, *supra.*

■ The laws of Pennsylvania and New Jersey diverge, however, with respect to punitive damage vicarious liability on the

---

3. As a threshold matter, defendant argues that its status as a quasi-governmental agency renders it immune from liability for punitive damages. This issue has been addressed in a companion case arising out of this accident, however, and was decided against Amtrak. *Sentner v. Amtrak,* 540 F.Supp. 557, 561 (D.N.J.1982) ("Amtrak cannot be viewed ... as an instrumentality of the United States immune from punitive liability."). Accordingly, this Court adopts the *Sentner* holding in this case.

4. Restatement (Second) of Torts § 908 states:
 (1) Punitive damages are damages, other than compensatory damages or nominal damages,

awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.
(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his *reckless indifference to the rights of others.* In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant. (Emphasis added.)

part of a corporation for the acts of its employees. Under Pennsylvania law, a corporation is liable for punitive damages for those acts of its agents or employees done within the scope of their authority, during the course of their employment, with the intent of furthering the corporation's interests. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1264 (1983); *Skeels v. Universal C.I.T. Credit Corp.*, 335 F.2d 846, 851–52 (3d Cir.1964). New Jersey, on the other hand, adheres to a more restrictive standard that an award of punitive damages against a corporation for misconduct of a servant or agent is not appropriate unless the corporation either authorizes, ratifies or participates in committing the act, or the agent who committed, authorized or ratified the act had such authority as to be fairly considered executive in character. *Security Aluminum Window Manufacturing Corp. v. Lehman Associates, Inc.*, 108 N.J.Super. 137, 260 A.2d 248, 253 (1970); *Winkler v. Hartford Accident & Indemnity Co.*, 66 N.J.Super. 22, 168 A.2d 418, *certif. denied*, 34 N.J. 581, 170 A.2d 544 (1961).

 Under New York's "interest analysis" approach, the court should apply the "law of the jurisdiction having the greatest interest in the litigation ... and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Miller v. Miller*, 22 N.Y.2d 12, 15–16, 290 N.Y.S.2d 734, 737, 237 N.E.2d 877, 879 (1968). *See generally Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). This analysis applies to a court's determination as to which state's law of punitive damages should govern in a particular case. *James v. Powell*, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967).

> An award of punitive damages ... depends upon the *object or purpose* of the wrongdoing and on this issue we should look to the "law of the jurisdiction with

the strongest interest in the resolution of the particular issue presented."

19 N.Y.2d at 259, 279 N.Y.S.2d at 18, 225 N.E.2d at 746 (emphasis in original), *quoting Babcock v. Jackson*, 12 N.Y.2d 473, 484, 240 N.Y.S.2d 743, 752, 191 N.E.2d 279, 285 (1963). Under New York's interest analysis test, the Court should consider, *inter alia*, plaintiff's domicile, defendant's place of business, the location of the accident, the place where the misconduct causing the accident occurred, as well the basic policies underlying the field of law. *See Boy Scouts of America*, 65 N.Y.2d at 201, 491 N.Y.S.2d at 95, 480 N.E.2d at 685; Restatement (Second) of Conflict of Laws, §§ 6 & 145 (1971). Application of these criteria to the facts of this case indicates that Pennsylvania has the strongest interest in having its law govern the assessment of punitive damages.

In this case, a Pennsylvania domiciliary boarded a Philadelphia-bound train in New York. The accident occurred in New Jersey. Instances of misconduct apparently took place in Pennsylvania, where the work train was unloaded and inspected for loose rails before it was approved for travel to the Hudson, New Jersey train yard and its eventual destination of New Haven, Connecticut. A cursory inspection of the train also took place in New Jersey when it became apparent that some loose material was trailing from the train. Plaintiff also alleges that certain misconduct occurred within Amtrak management with respect to an inadequate response to the March 30, 1980 derailment and the decision to allow an inexperienced track supervisor to oversee the unloading of the work train. Amtrak's managerial decisions in response to the March 30 derailment took place in Philadelphia, Pennsylvania, where the Northeast Corridor Improvement Group has its headquarters. The March 31st memorandum issued from that office.

The issue presented in this case involves a conflict regarding the rules of vicarious liability, but this determination is being made with respect to the assessment of punitive damages. Thus, the interest of

plaintiff's domicile has little relevance since punitive damages are designed to punish a defendant, not to compensate a plaintiff. *In re Air Crash Disaster Near Chicago,* 644 F.2d 594, 612–13 (7th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981). Similarly, where the place of injury, in this case New Jersey, is largely fortuitous, as here, "its interest in and ability to control behavior by deterrence or punishment, or to protect defendants from liability, is lower than that of the place of misconduct or principal place of business." 644 F.2d at 615.

Defendant, a Washington, D.C. corporation, does business in several states. It argues, nevertheless, that New Jersey's interest in protecting or punishing Amtrak is strongest since the accident happened there. But each of the states where Amtrak operates trains and engages in track and rail repair and replacement operations have an equally strong interest in applying its law to deter similar conduct from occurring within its borders in the future. Thus the interests of Pennsylvania and New Jersey in this regard cancel each other.

The factor determinative of this issue therefore is the place where the conduct causing the injury occurred. The majority of the actions leading up to the accident occurred in Pennsylvania. The memorandum circulated to all Division Engineers in response to the March 30 derailment was issued by defendant's Philadelphia Northeast Corridor Improvement Group office. The decision to appoint an inexperienced track supervisor to oversee the unloading operations was made in Pennsylvania. Preparation of the train for movement to New Jersey and its eventual destination of New Haven took place in Pennsylvania. The decision to allow the train to proceed even though it had no rear cabin which would have allowed members of the train crew to observe the condition of the train was made in Pennsylvania. As discussed previously, the fact that the accident occurred in New Jersey was fortuitous. The likelihood of the accident occurring in New York or Connecticut was just as great.

Thus the law of Pennsylvania, the state with the strongest relevant interest, shall apply to the issue of whether punitive damages should be assessed against defendant. This result is consistent with New York choice-of-law principle that the locus of the accident has a minimal interest when such a contact is merely fortuitous. *See Boy Scouts of America,* 65 N.Y.2d 189, 200, 491 N.Y.S.2d 90, 94–96, 480 N.E.2d 679, 685 (1985). This holding, of course, applies not only to the appropriate standard for determining whether defendant's conduct was so outrageous that assessment of punitive damages is appropriate, but also with regard to the application of Pennsylvania's standard with regard to the imposition of vicarious liability on a corporation for the acts of its agents and employees.

### CONCLUSION

Defendant's motions to dismiss the complaint and for a determination that New Jersey law should apply to the issue of punitive damages are denied.

SO ORDERED.