David L. MARSCHAND, Plaintiff,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.

David L. MARSCHAND, Plaintiff,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, and Norfolk Southern Company, Defendant.

Nos. 1:93–CV–134, 1:94–CV–120.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Feb. 10, 1995.

John C. Theisen & Thomas N. O'Malley, Gallucci, Hopkins, & Theisen, P.C., Fort Wayne, IN, for plaintiffs.

John C. Duffy, Geoffrey L. Blazi & Russel H. Hart, Stuart & Branigan, Lafayette, IN, for defendants Norfolk and Western Railway and Norfolk Southern Corp.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

The Plaintiff, David L. Marschand ("Marschand"), has two lawsuits pending before this Court. On May 19, 1993, Marschand filed a claim against the Defendant, Norfolk and Western ("NW") under the Federal Employers' Liability Act, ("FELA"), 45 U.S.C. § 51 *et seq.* On April 28, 1994, Marschand filed a claim against NW and Norfolk Southern Corporation ("NS" and hereinafter collectively referred to as "the Railroad"), alleging a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* At a status conference held on June 3, 1994, the Court consolidated the two cases for all pretrial proceedings.

This matter is now before the Court[1] on the Defendants' Motions for Summary Judgment filed September 29, 1994. NW is seeking partial summary judgment of Marschand's FELA claim, and the Railroad seeks summary judgment of Marschand's ADA claim. Marschand filed a response brief on December 30, 1994, and the Defendants filed their reply brief on January 13, 1995. For the reasons stated below, the Defendants' Motions for Summary Judgment are GRANTED.

## II. FACTS

Marschand was hired by the Railroad as a train brakeman in 1989. (Marschand Dep. I, p. 103). In March of 1990 Marschand under-

went Locomotive Engineer Training, and served as a student engineer for one year, at which time he qualified as a full engineer. (*Id.* at 103–05). On March 12, 1991, Marschand was the engineer of a NW train involved in a grade crossing accident. (Plaintiff's exh. 3, accident report). The accident occurred when a pick-up truck carrying a young couple and their 10 year old daughter ("the Lacy family") entered the crossing at the same time as the NW train. *Id.* The train broadsided the pick-up truck, instantly killing the Lacy family. *Id.* Marschand suffered no physical injuries as a result of the accident. He did feel the impact of the crash, and at the moment of impact he was aware that he could be injured if struck with flying debris. He and the other members of the train crew ducked to avoid any possible debris.

After the accident Marschand engineered the train for the remainder of its March 12, 1991, trip. (Marschand Dep. I, p. 186). For the next year Marschand continued to work for NW as a brakemen, conductor and engineer. However, on March 12, 1992, (the one year anniversary of the accident), he claims to have suffered a complete and total mental breakdown. (*Id.* 186–190). Immediately following his breakdown, Marschand was unable to return to work.[2] One week later Marschand began treating with Dr. Steven Ross ("Dr. Ross"), a psychologist. Marschand's psychotherapy with Dr. Ross continues to date.

Dr. Ross has diagnosed Marschand as suffering from post-traumatic stress disorder ("PTSD") caused by the trauma of the accident. (Plaintiff's exhibit 12, Ross Aff. ¶¶ 3, 8). Much of Marschand's emotional distress is caused by feelings of guilt, "survivor's syndrome," and grief and bereavement associated with the death of the Lacy family. (Plaintiff's exhibit 12, Ross Aff. ¶ 8). Marschand continues to suffer from PTSD, which generally manifests itself in tension, anxiety and depression. Dr. Ross has further opined

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Marschand remained unemployed until January 5, 1995, when he was rehired by NW as an extra-board clerk. It is unclear what Marschand's employment status was with NW from March 12, 1992 through January 5, 1995.

that his condition is magnified by the stress of his current lawsuits. (Ross Dep., p. 39). While Dr. Ross has reservations about whether Marschand will ever make a full recovery, he does not believe that Marschand will do so before this litigation is over. (Ross Dep., p. 39).

Nevertheless, by October of 1991, Marschand had made some improvement, because on October 22, 1991, Marschand, through Dr. Ross, requested a return to work. On that date, Dr. Ross sent a letter to M.D. Manion ("Manion"), NW Superintendent for the Lake Division. (Defendants' exh. 3). That letter states in relevant part:

I do have some reservations about Mr. Marschand's return to work. I believe that if Norfolk Southern would allow him to return to work, that he should do so on a limited basis. I do not believe that he should be permitted to operate a train nor should he be involved in the everyday activities in the yard. David has reported to me that he would be able to engage in either custodial or clerical work.

*Id.*

Thereafter, on November 2, and again on November 18, 1992, Marschand personally wrote to Manion expressing his desire to return to work in a limited capacity. Marschand indicated he needed a "low stress" position, preferably working as a clerk or custodian on a limited basis. (Defendants' exh. 4 & 5).

Marschand's employment request was brought to the attention of Eileen Myers ("Myers"), the Chief Clerk for the Lake Division. After conferring with the head clerk in the transportation department, Myers determined that a clerk position was available. (Myers Dep., p. 47–48). Myers notified Manion, who then forwarded Marschand's correspondence to NW's Medical Director, Dr. J.P. Salb, for a medical review. Manion specifically requested that Dr. Salb evaluate Marschand's fitness for engine service,[3] as well as working as a yard clerk. (Defendants' exh. 6).

On February 8, 1993, Dr. Salb assessed that Marschand was not qualified for engine service, but he could perform the duties of a yard clerk. (Defendants' exh. 7). On March 8, 1993, Dr. Salb reviewed Dr. Ross' medical records, and reconfirmed his earlier opinion that Marschand could not work in engine service, but could work as a yard clerk. (Defendants' exh. 8).

Marschand's case was also reviewed by Dr. Frank N. Bilisoly, NW's Medical Review Officer. Dr. Bilisoly spoke with Dr. Ross about the duties of an "extra board clerk" to determine whether, in Dr. Ross' opinion, Marschand could perform this job. (Defendants' exh. 9). Dr. Ross agreed with Dr. Bilisoly that Marschand was capable of returning to work as an extra board clerk. (Defendants' exh. 9). Accordingly, on March 9, 1993, Dr. Bilisoly gave Marschand medical clearance for the clerk position and he instructed Manion to schedule Marschand for a physical, drug screen and audiogram. (Defendants' exh. 9).

An extra board clerk is considered clerical. The "clerical" category encompasses a broad range of positions (including janitor), all of which frequently require the use of a personal computer. (Myers Dep., pp. 11, 75–76). Accordingly, for the past 10 years NW has required that an individual be able to establish a minimum typing proficiency of 35 words per minute. (Myers Dep., pp. 13, 61, 72). Thus, before Marschand could be hired as an extra board clerk he was required to pass a typing test.

Marschand first took his typing test on March 23, 1993. (Plaintiff's exh. 8). He failed the test, receiving a score of only 12 words per minute. (Defendants' exh. 12). On March 29, 1993, Marschand wrote to Myers about his test scores, and indicated that should he be unable to qualify for a clerk position, he would like to be considered for any other available position. (Plaintiff's exh. 8). Marschand again wrote to Myers on April 20, 1993, reiterating his desire to work for the Railroad in any position. (Plaintiff's exh. 9) He also stated that he was practicing his typing with the hope of meeting the

3. The terms "engine service" and "train service" have been used frequently by the parties, and both refer to any position which deals with the movement of trains.

requirements of the available clerk position. *Id.* Of course, all positions available in Myers' department were subject to the minimum typing proficiency requirement. (Myers' Dep., pp. 60–61). On April 23, 1993, Myers wrote back to Marschand about his test scores, and she invited him to re-take the test when he felt he was able to obtain the required speed. (Defendants' exh. 12). Marschand took the typing test at least two more times, but, although his scores had improved, he still did not pass.

At some point in time Myers determined that Marschand might never pass the typing test, and therefore, would be unable work in her department. However, it was also clear to her from Marschand's correspondence that he wanted to return to work for the Railroad in any capacity. (Myers Dep., pp. 46–47). Therefore, a few months after his initial request for employment, Myers forwarded Marschand's correspondence to Mr. Richard S. Hayth ("Hayth"), the Railroad's System Manager for Disability Support Services. (Myers Dep., pp. 46–47).

On August 10, 1993, Marschand filed a charge of discrimination with the EEOC, alleging that the Railroad had refused to offer him an available positions on account of his PTSD, in violation of the ADA. (Defendant's exhibit 13, EEOC charge).

On September 2, 1993, Hayth wrote to Marschand's counsel with information on the opportunities available to Marschand under the Railroad's new "Accelerated Rehabilitation Program." (Defendant's ex. 14). Hayth explained that the purpose of the program was to help secure alternative employment for individuals who, as a result of injury, could no longer perform their past work for the Railroad. *Id.* Hayth further explained that under the program he would first look for an alternative position in Marschand's department, and noted the available clerk position that Marschand had already attempted to qualify for. With regard to Marschand's inability to pass the typing test, Hayth offered to pay Marschand's tuition for a typing class. *Id.* Hayth further stated that if no position could be found within Marschand's department, the next step would be to look to other departments within the Railroad. However, Hayth qualified this option with the requirement that before Marschand could be considered for any other position he would need to submit to testing with the Personnel Department "to determine if he has aptitudes and abilities for any other type of work on [the] railway company." *Id.* Concurrent with this process, the Railroad would consider any further vocational training or education necessary to accommodate Marschand. *Id.* Finally, in the event that no position could be found for Marschand within the Railroad, it would help him find employment with another company, and would consider hiring a vocational specialist to assist in this matter. *Id.*

Marschand accepted the Railroad's offer to pay for typing classes, and enrolled in classes sometime in June or July of 1994, but, he has never submitted to the Personnel Department's aptitude test. (Marschand Dep., p. 262). Marschand took another typing test in September 1994, and although his results had improved considerably (he scored 28 words per minute) he did not pass the test. Marschand took the test again on December 14, 1994, and again did not pass—in fact this time his score went down. On December 15, 1994, the Railroad decided that it would make an exception for Marschand and it waived its typing requirement. It then offered Marschand his choice of three clerical positions: extra board clerk, janitor/messenger, and janitor/driver. (Defendant's reply exhibit 1). Marschand accepted the extra-board clerk position; he was released by Dr. Ross for this job; and he began on January 5, 1995.

### III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judg-

ment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 112 S.Ct. at 2512; *In Re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. FED.R.CIV.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

In any event, in employment discrimination matters, the standard on summary judgment is applied with "added rigor." *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993). As the Seventh Circuit recently reiterated in *Robinson v. PPG Industries, Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994), citing the standard set out in *Sarsha:*

> Summary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Accordingly, we will affirm the decision of

the district court only if, had the record before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict. [citations omitted].

*Id.*[4]

## IV.  DISCUSSION

### A.  *FELA Claim*

Marschand filed a FELA claim against NW on May 19, 1993, seeking recovery for severe emotional distress that he allegedly suffered as a result of the March 12, 1991, grade crossing accident. In support of his claim Marschand alleged that NW committed several negligent acts which proximately caused the grade crossing accident and his resulting PTSD. NW seeks summary judgment on two of these claims. In addition, the Railroad has moved for partial summary judgment limiting the scope of Marschand's damages.

#### 1.  *Absence of a Trainmaster or Roadforeman*

One of the specific acts of negligence claimed by Marschand is the failure of NW to provide a trainmaster or roadforeman for the May 12, 1991, trip. NW contends it is entitled to summary judgment of this claim because there is no evidence in the record suggesting that the absence of a trainmaster or roadforeman is causally related to the accident. In his response, Marschand concedes that this claim is not supported by the evidence, and that summary judgement on this claim is appropriate.

#### 2.  *Failure to Provide Post-Accident Counseling*

Marschand has also alleged that his PTSD was exacerbated by NW's failure to provide him with post-accident counselling. NW argues that summary judgment of this claim should be granted because it had no duty to provided such counselling. Marschand agrees that this claim is not supported by law and concedes summary judgment on this claim.

#### 3.  *Recoverable Damages for Emotional Distress*

Marschand seeks compensation for all of the emotional distress damages he has suffered, including, not only the harm caused by fear for his own safety, but also the distress related to his grief and bereavement arising from the deaths of the Lacy family. NW's motion for summary judgment asks the Court to limit Marschand's claim to only those damages arising from emotional distress allegedly resulting from Marschand's fear for his own safety. Thus, the Railroad seeks to exclude any damages attributable to Marschand's grief and bereavement over the death of the Lacy family.

At the heart of the current issue is the parties disagreement over the proper interpretation of the United States Supreme Court's recent decision in *Consolidated Rail Corp. v. Gottshall,* —— U.S. ——, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). In *Gottshall,* the Supreme Court defined the parameters of recovery for claims of negligent infliction of emotional distress under the FELA. Specifically, the Court addressed the right to recover for "mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms." *Id.* at ——, 114 S.Ct. at 2405. Initially, the Court held that "a railroad [does] ha[ve] a duty under the FELA to avoid subjecting its workers to negligently inflicted emotional injury." *Id.* at ——, 114 S.Ct. at 2408.

In assessing the scope of a railroad's duty to avoid causing such injuries, the Court analyzed the three prevailing common law rules governing recovery in a negligent infliction of emotional distress case. After careful review, the Court adopted the "zone of danger" test as the one to govern FELA claims for the negligent infliction of emotional distress. *Id.* at ——, 114 S.Ct. at 2410.

Under this test, a worker within the zone of danger of physical impact will be able to

---

4.  The anachronistic term "Directed Verdict" is no longer used; rather, it has been more accurately retitled "Judgment as a Matter of Law." *See,* Fed.R.Civ.P., 50(a). A defendant is entitled to such a judgment if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff. *Id.*

recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not. Railroad employees thus will be able to recover for injuries-physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical impact.

*Id.* at ——, 114 S.Ct. at 2410–11 (emphasis added). NW contends this language clearly precludes Marschand from recovering for any emotional damages not caused by fear for his own safety. Marschand responds that he need only show that he suffered some emotional harm as a result of fear for his safety, and that once he crosses that threshold he may recover for any other emotional injuries proximately caused by NW's alleged negligence.

The Court believes that NW's interpretation of the *Gottshall* decision is the correct one. First, beginning with the *Gottshall* Court's definition of the zone of danger test, the express language of the opinion limits Marschand to "recovery for emotional injury caused by fear of physical injury to himself." *Id.* at ——, 114 S.Ct. at 2411. Marschand argues that this passage only supports such a limitation if read in isolation, but, when read in the context of the entire opinion a broader rule of recovery is evidenced. In fact, however, a careful reading of the entire opinion lends even further support for a rule of limited recovery as espoused by NW.

In choosing the appropriate standard of recovery, the Court first looked to the congressional intent behind the FELA—to protect railroad workers from the physical perils of railroading. *Id.* The importance of the congressional purpose is evident from the Court's reasons for rejecting the other two alternatives to the "zone of danger" test: the "physical impact" test and the "relative bystander" rule. The Court refused to adopt the "physical impact" test, which permits recovery to those plaintiffs who are seeking damages for "emotional injury stemming from a negligent act who had contemporaneously sustained a physical impact (no matter how slight) or injury due to the defendant's conduct." Although the Court recognized that the physical impact test "would achieve

many of the same ends as the zone of danger test," it rejected the rule as being both too restrictive, as well as inconsistent with the FELA's broad remedial purposes. *Id.* at ——, 114 S.Ct. at 2410. The Court explained, "[w]e see no reason ... to allow an employer to escape liability for emotional injury **caused by apprehension of physical impact** simply because of the fortuity that the impact did not occur. *Id.* at ——, 114 S.Ct. at 2311 (emphasis added).

The Court also rejected the "relative bystander" test which permits recovery for emotional distress to a plaintiff who witnesses the injury or death of a third person to whom the plaintiff is closely related. *Id.* at ——, 114 S.Ct. at 2411. Among the Court's reasons for dismissing this test was that it found the relative bystander rule inconsistent with purpose of the FELA, which is to protect railroad workers from physical harm. *Id.*

The *Gottshall* Court found that the purpose of the FELA is to protect railroad employees from not only from physical perils associated with railroading, but also the threat of such physical perils. *Id.* at ——, 114 S.Ct. at 2410. Concomitant with that purpose, the FELA imposes a duty upon railroads to refrain from exposing their employees to physical harm, or the threat of physical harm, and it permits employees to recover for the physical and emotional harm proximately caused by a railroad's breach of that duty. *Id.* at ——, 114 S.Ct. at 2408–2411. Thus, an employee threatened with imminent physical harm as a result of the Railroad's negligence may recover for any emotional injury resulting from fear from his own safety. In such a case, recovery is appropriate because the employee's injury is the proximate result of the Railroad's breach of a duty owed directly to the employee. *Id.* at ——, 114 S.Ct. at 2408–2411; Douglas Bryan Marlowe, Comment, *Negligent Infliction of Mental Distress: A Jurisdictional Survey of Existing Limitation Devices and Proposal Based on an Analysis of Objective versus Subjective Indices of Distress*, 33 VILL.L.REV. 781 (1988). Emotional damages caused by witnessing harm or peril to another, however, are not recoverable because

they are not caused by a breach of duty owed to the employee-plaintiff. Marlowe, *Negligent Infliction of Mental Distress*, 33 Vill. L.Rev. 781 (1988). Rather, they arise as a result of the railroad's independent and separate breach of duty owed to the injured third person, *Id.* Therefore, these additional damages are inconsistent with the FELA's purpose as identified by the *Gottshall* Court because they go beyond the statute's remedial goals.

In addition to the FELA's remedial purpose, the *Gottshall* Court looked to the status of the common law at the time that the FELA was enacted, 1908. The Court acknowledged that the weight of American authority favored the physical impact rule, but found that a number of jurisdictions employed the zone of danger rule. The Court preferred the zone of danger rule because it was considered progressive in 1908, and therefore more consistent with the FELA's broad remedial goals. *Id.* at ——, 114 S.Ct. at 2410. It rejected the relative bystander rule, which was announced in 1968, *see Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), because it lacked historical support. *Gottshall*, —— U.S. at ——, 114 S.Ct. at 2410.

Nonetheless, the zone of danger test is not monolithic. For example, Marschand contends that an appropriate reading of the zone of danger rule permits recovery for *all* emotional harm proximately caused by the defendant's negligence if the plaintiff can establish that he was within the zone of danger and feared for his own safety. In support of this view, Marschand relies on the case of *Dobelle v. National R.R. Passenger Corp.*, 628 F.Supp. 1518 (S.D.N.Y.1986). In *Dobelle*, the plaintiff was riding on a westbound passenger train when a fifteen foot rail protruding from an eastbound freight train sliced through the passenger car he was sitting in. Although the plaintiff was not physically injured, several of the passengers around him were killed or seriously injured. The plaintiff suffered severe emotional distress caused by fear for his own safety, as well as seeing the injuries sustained by the other passengers. *Id.* The defendant in *Dobelle* argued that plaintiff's damages were limited to only

that emotional harm caused by fear of imminent harm to himself. *Id.* at 1525. The court, applying Pennsylvania law, rejected defendant's argument, and held that under the zone of danger test, once the plaintiff establishes that he was in the zone of danger and actually feared for his personal safety, he may recover for any other emotional harm proximately caused by the defendant's negligent act. *Id.* at 1525–26.

However, contrary to Marschand's suggestion, *Dobelle* is not the definitive majority rule. In fact, at least two other rules of recovery have emerged under the zone-of-danger test. For example, in *Carlson v. Illinois Farmers Ins. Co.*, 520 N.W.2d 534 (Minn.App.1994), plaintiff was injured, and her best friend killed, when the car they were passengers in lost control and hit an embankment. The plaintiff sought recovery for her physical injuries, and emotional distress resulting from those injuries, as well as emotional distress resulting from witnessing the death of her best friend. The trial court dismissed plaintiff's claim for emotional distress resulting from witnessing her best friend's death, and the appellate court affirmed. The appellate court held that under the zone of danger rule "[o]nly damages for distress arising from the plaintiff's fear for her own safety are recoverable." *Id.* at 536; *see also, Rickey v. Chicago Transit Auth.*, 98 Ill.2d 546, 75 Ill.Dec. 211, 457 N.E.2d 1, 5 (1983); *Kapoulas v. Williams Ins. Agency, Inc.*, 11 F.3d 1380, 1382 (7th Cir.1993) (Illinois zone of danger rule only permits recovery for emotional damages resulting from fear for one's own safety); *Shelton v. Russel Pipe & Foundry*, 570 S.W.2d 861, 864 (Tenn. 1978); *Heldreth v. Marrs*, 188 W.Va. 481, 425 S.E.2d 157, 169 (1992) (abolishing zone of danger test as too restrictive because it only permits recovery for emotional damages suffered as a result of fear for one's own safety); *Bowen v. Lumbermens Mut. Casualty Co.*, 183 Wis.2d 627, 517 N.W.2d 432 (1994) (same).

While a few jurisdictions do allow a plaintiff within the zone of danger to recover those damages attributable to the emotional distress caused by the contemporaneous observation of injury or death, they are limited

to instances involving immediate family members or close personal relations. *Bovsun v. Sanperi*, 61 N.Y.2d 219, 473 N.Y.S.2d 357, 461 N.E.2d 843, 849 (1984); *Quinn v. Turner*, 155 Ariz. 255, 745 P.2d 972, 973 (App.1987); *Asaro v. Cardinal Glennon Memorial Hosp.*, 799 S.W.2d 595 (Mo.1990). This is also the rule of the Restatement. RESTATEMENT 2d of TORTS, §§ 313 & 436(c). Of course, this rule does not help Marschand since the individuals killed were strangers to him.

Therefore, among those jurisdictions that have adopted the zone of danger rule, there is clear disagreement over the proper scope of recovery. However, there is no reason to believe that the Supreme Court in *Gottshall*, in fashioning a rule for universal FELA application, was at the same time tacitly embracing a minority position on damages, e.g., *Dobelle*, over those formulations adopted in *Carlson*, 520 N.W.2d 534, or *Bovsun*, 473 N.Y.S.2d 357, 461 N.E.2d 843. In fact, *Dobelle* is more consistent with the growing modern trend to expand the scope of liability for negligent infliction of emotional distress. *See generally*, Marlowe, *Negligent Infliction of Mental Distress*, 33 VILL.L.REV. 781 (1988). On the other hand, the decisions which limit the recovery of emotional damages stemming from fear for ones own safety more faithfully represent the status of the law at the time the FELA was enacted, *Id.*, and therefore are more consistent with the historical emphasis employed by the *Gottshall* Court.[5]

Therefore, the Court finds that the rule announced in *Gottshall* limits recovery for the negligent infliction of emotional distress to emotional harm caused as a result of fear for one's own safety. Accordingly, NW's motion for partial summary judgment is granted. Marschand is thus able to recover only for that emotional distress caused by fear for his own safety.

---

5. Marschand also argues that the recent decision in *Bloom v. Consolidated Rail Corp.*, 41 F.3d 911 (3rd Cir.1994), supports his position. In *Bloom*, the plaintiff was awarded damages for the severe emotional distress he suffered after the train he was operating struck and killed a pedestrian. The Third Circuit reversed the jury award and instructed the District Court to enter judgment for the defendant because the plaintiff failed to

### B. ADA claim

■ On April 28, 1994, Marschand filed an ADA claim against the Railroad alleging unlawful discrimination and retaliation. Marschand alleged that after his mental breakdown the Railroad refused to rehire him in another position, and that such refusal was due to his PTSD. Marschand also alleged that the Railroad took retaliatory action against him after he filed an EEOC charge. Marschand now concedes that he has no evidence of retaliation, and that summary judgment on that claim is appropriate. The Railroad has moved for summary judgment of Marschand's claim of discrimination, or in the alternative, on the claim for punitive damages.

> The ADA prohibits discrimination
>
> against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The Railroad argues that Marschand is not a "qualified individual with a disability," because he is not disabled. "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further defines disability as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. 12102(2). Marschand contends that he is disabled because he suffers from a

show that he was ever placed in immediate risk of physical harm since, at all times, he safely rode in the locomotive's cab. *Id.* at 917. Although the Third Circuit, in a footnote, questioned whether Bloom had feared for his own safety, and further, what the legal import of that fear would be, it did not resolve these matters. *Id.* at 915, n. 4. Nor did it provide any guidance upon the issues currently before this court.

mental impairment which substantially limits a major life activity (i.e., working). Alternatively he argues that the Railroad perceives him as having such an impairment.

### 1. Impairment substantially limiting a major life activity

Under the ADA, an individual is considered disabled if he suffers from a "physical or mental impairment that substantially limits a major life activity." *Id.* It is undisputed that Marschand's PTSD qualifies as a "mental impairment." The fact that Marschand may have a mental impairment, however, does not mean he is disabled. Marschand must also show that his PTSD substantially limits one of his major life activities. *Id.* Pursuant to the ADA's implementing regulations, major life activity "means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).[6] A limitation is substantial if it renders the individual:

   (i) Unable to perform a major life activity that the average person in the general population can perform; or

   (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).

Marschand asserts that his PTSD imposes a substantial limitation on his ability to work.

   (3) With respect to the major life activity of *working*—

   (i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. 1630.2(3)(ii). Under this standard, Marschand's PTSD must preclude him from more than a narrow range of jobs, it must create a significant barrier to employment generally. *Byrne v. Board of Educ., School of West Allis–West Milwaukee,* 979 F.2d 560, 565 (7th Cir.1992); *see also, Welsh v. City of Tulsa,* 977 F.2d 1415, 1419 (10th Cir.1992), (plaintiff not disabled where numbness of fingers disqualified him from service as a firefighter); *Maulding v. Sullivan,* 961 F.2d 694, 698, *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993) (8th 1992) (chemist not disabled where chemical sensitivity prevented her from doing lab work); *Daley v. Koch,* 892 F.2d 212, 215–16 (2nd Cir.1989) (plaintiff who was disqualified from service as a policeman due to "poor judgment, irresponsible behavior and poor impulse control" not disabled); *Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986) (acrophobia not a disability).[7]

Marschand asserts that his PTSD precludes him from working in any position where he would be responsible for the safety of others, which he describes as a substantial limitation on his ability to work. The Railroad's response is two-fold. First, the Railroad argues that Marschand's PTSD actually precludes him from a narrower range of jobs. The Railroad argues that Marschand's only true limitation is that he cannot work on or around trains.[8] In support of that claim, the

---

**6.** Although the implementing regulations are not binding upon this court, they are entitled to considerable weight. *Kerno v. Sandoz Pharmaceuticals Corp.,* 1994 WL 511289 *7, n. 15 (N.D.Ill.1994).

**7.** Many of the cases cited in this Memorandum of Decision and Order interpret the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Because the language adopted in the ADA tracks that of the Rehabilitation Act, and because Congress intended the ADA to be interpreted consistently with the Rehabilitation Act. 42 U.S.C. 12117(b), this

Court relies on these cases as persuasive authority. *White v. York International Corp.,* 45 F.3d 357, 1995 WL 3735, n. 5 (10th Cir.1995).

**8.** Actually, the Railroad suggests that Marschand may be exaggerating the effect of his PTSD, or malingering to achieve a better result in this lawsuit, and seems prepared to argue this point at trial. Nevertheless, they have conceded that he is absolutely precluded from train service or engine service for purposes of this motion.

Railroad points out that in correspondence with the Railroad, Marschand and Dr. Ross have maintained that Marschand's only limitation is that he should not work in a position involving the operation of a train. (Defendant's exh. 3, 4, 5, 16). Both Marschand and Dr. Ross continued to adhere to this limitation in their respective depositions. (Marschand Dep., pp. 278, 342); (Ross Dep., p. 50). However, Dr. Ross' has now opined for the first time in his most recent deposition installment (which was taken two years after Marschand filed his EEOC charge and six weeks after Defendants filed the present motion for summary judgment) that Marschand should also avoid taking any position where he would be responsible for the safety of others. Marschand has never personally acknowledged this restriction.

To the extent that Dr. Ross' recent testimony conflicts with his earlier opinions and Marschand's views, it creates a question of fact. Specifically, this recent testimony goes to Dr. Ross' credibility and the weight of his testimony. In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. at 2511. Thus, for the purposes of this motion we must resolve the conflicting testimony in Marschand's favor, and assume that he is precluded from any employment where he bears responsibility for the safety of others.

Even with this new testimony, the Railroad continues to argue that Marschand has failed to come forward with specific facts showing that his alleged impairment is a significant barrier to employment generally. Several factors are relevant to determining whether an impairment substantially limits an individual's employment potential.

> They include '(1) the number and type of jobs from which the impaired individual is disqualified, (2) the geographical area to which the individual has reasonable access, and (3) the individual's job expectations and training.'

*Welsh*, 977 F.2d at 1419 (10th Cir.1992) (quoting *Jasany v. United States Postal Ser-*

*vice*, 755 F.2d 1244, 1249 (6th Cir.1985); *see also*, 29 C.F.R. § 1630.2(j)(3)(ii); *Forrisi*, 794 F.2d at 933. The plaintiff's evidentiary burden with respect to these factors is not an onerous one. Nevertheless, the plaintiff must provide some "evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs ("few," "many," "most") from which an individual would be excluded because of an impairment." 29 C.F.R.App., § 1630.2(j). The plaintiff must make this minimum showing to sustain his summary judgment burden. *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 944 (10th Cir.1994); *Nicandro v. Berkeley Farms, Inc.*, 1994 WL 705267 (N.D.Cal.1994).

For example, in *Bolton*, the plaintiff offered medical evidence that he could not return to his prior work, or to any work where he had to stand on a concrete floor all day. 36 F.3d at 944. He further offered the opinion of the workers compensation board that he had a nine percent permanent partial disability of one foot and twenty-percent permanent partial disability of the other foot. *Id.* The Court noted that Plaintiff offered no evidence of his vocational training, geographical area to which he had access, or the number or type of jobs demanding similar training from which he would also be excluded. *Id.* As a result, Plaintiff had not sustained his summary judgment burden because he produced no evidence showing a significant restriction upon his ability to work. *Id.; see also, Nicandro*, 1994 WL 705267 at *4; *compare Scharff v. Frank*, 791 F.Supp. 182, 186–87 (S.D.Ohio 1991) (plaintiff established substantial limitation on ability to work where vocational expert estimated that plaintiff could not perform approximately half of the unskilled jobs in the local economy).

Marschand has failed to produce any evidence relating to these factors—a failure fatal to his claim. All that Marschand offers is the following conclusion: "[a]part from not being able to return to work as an engineer or, for that matter, train or engine service, Marschand is unable to work in *any* position where someone else' safety and well-being are in his hands." (Plaintiff's br., p. 14–15,

emphasis in original). From such an ill-defined proposition, Marschand then makes this significant jump: "Obviously the foregoing restrictions, by their very nature, take Marschand out of the running for a wide range of jobs." *Id.* However, Marschand's conclusion that he is excluded from a broad range of jobs is anything but obvious. In fact, other than the specific position of train or engine service,[9] the record offers little guidance as to those jobs Marschand cannot perform.

Dr. Ross has testified that Marschand should not operate heavy and skilled machinery near lots of other people. (Ross Dep., p. 103). This cursory description gives no indication as to the types of jobs, **if any,** which are prohibited, how many of these jobs exist in the geographic area to which Marschand has access, or whether Marschand has any training or expectations of employment in this field. *Bolton,* 36 F.3d at 944. Dr. Ross also states that Marschand should not be a policeman, fireman or ambulance driver, and may not be able to drive a bus. (Ross Dep. pp. 103, 209. Dr. Ross' testimony essentially shows that Marschand is unable to perform a small range of jobs in two classes—operation of public transportation vehicles, and protection of public safety. But, while Marschand has identified two types of jobs that he can not perform, he has not established a significant barrier to his employment generally. *Bolton v. Scrivner, Inc.,* 836 F.Supp. 783, 788 (W.D.Okla.1993); *aff'd,* 36 F.3d 939 (10th Cir. 1994) (Evidence that Plaintiff is restricted from doing a number of physical jobs does not answer the inquiry of how impairment restricts overall employment opportunities). For example, there is no evidence suggesting just how many jobs in the local economy exist in these two fields. In fact, these positions seemingly encompass only a very narrow range of jobs. Moreover, with regard to the public safety field, there is no indication in the record that Marschand has ever had any training for, or expectations of becoming a police officer, fireman or ambulance driver. 29 C.F.R. 1630.2(j)(3)(i); *Partlow v. Runyon,* 826 F.Supp. 40, 46 (D.N.H.1993). *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088,

1101 (D.Hawaii 1980) (the plaintiff's job expectations and training must be taken into account).

Further, the record suggests that there are a substantial number of other jobs which Marschand can perform. To date, Marschand has applied for employment with at least 16 prospective employers, in a myriad of fields including: maintenance supervisor, machine operator, delivery man, mechanical draftsman, and foundry worker. Marschand's PTSD places no limitation on his ability to work in these positions. *Byrne v.,* 979 F.2d at 565 (quoting *Fuqua v. Unisys Corp.,* 716 F.Supp. 1201, 1205–06 (D.Minn.1989)) ("A court may also examine whether a plaintiff can or has procured other employment"). Thus, it is clear as a matter of law that Marschand's PTSD does not impose a significant limitation on his ability to work.

### 2. Regarded as Disabled

■ Marschand argues that even if he does not suffer from an impairment which substantially limits a major life function, NW regards him as having such an impairment. Regarded as having such an impairment means:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. 1630.2(*l*). Thus, it is not enough to show that the employer perceived the employee as impaired, the perceived impairment must substantially limit a major life activity. The employer does not "regard the employee as disabled simply by finding the employee to be incapable of satisfying the

---

**9.** Marschand concedes that the inability to work in train or engine service, alone does not constitute a significant limitation on his ability to work—i.e. a disability.

singular demands of a particular job." *Byrne,* 979 F.2d at 567; *Welsh,* 977 F.2d at 1419; *Maulding,* 961 F.2d at 698. "The proper test is whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs." *Partlow,* 826 F.Supp. at 45; *Stradley v. LaFourche Comm., Inc.,* 869 F.Supp. 442 (E.D.La.1994).

It is clear that the Railroad has acquiesced to the representations made by Marschand, and Dr. Ross, that Marschand can no longer work in train service or engine service. As discussed, *supra,* this impairment does not impose a significant restriction upon Marschand's ability to work. However, Marschand insists that it is obvious that the Railroad has considered his PTSD to be even more limiting, given that they have only offered him a clerk's job despite his willingness to accept any position. Marschand thus attempts to link this latest job offer to what he regards as the Railroad's perception of his ability to work; and to thus bootstrap his way into an ADA claim. However, the Court may not simply assume (as Marschand apparently does) that the Railroad's refusal to hire was prompted by their perception of Marschand's PTSD. Rather, Marschand must establish (at least generally) the Railroad's perception of his PTSD, and only then can a determination be made about whether that constitutes a disability.

Marschand does point to two pieces of evidence which he believes demonstrates that the Railroad's perceptions of his impairment were much broader than his actual limitations. Marschand claims that an April 7, 1993, letter from Manion to the General Attorney for the Railroad conclusively establishes that the Railroad perceived him as disabled.[10] In that letter Manion informed the Railroad's in-house counsel of Marschand's employment status. Manion wrote:

> Mr. Marschand was an engineer involved in a crossing accident on Mother's Day, in May of 1991 in which an entire family was killed. A year later, he experienced post accident trauma and has been unable to work since.

(Plaintiff's exh. 14). Marschand equates this paragraph to an opinion by Manion that Marschand's PTSD renders him unable to work in any position. Manion, however, has attested in an affidavit that his letter only restates what he had been told by Marschand and Dr. Ross—that Marschand was unable to work on or around trains. (Defendant's reply exh. 20, Manion aff.). In fact, at the time of Manion's letter Marschand was, indeed, unable to return to duty as an engineer. Furthermore, the remaining text of the letter supports Manion's explanation. In the very next paragraph Manion alerts corporate counsel of the Railroad's efforts to accommodate Marschand's request to be hired as a clerk, and of Marschand's inability to pass the requisite typing test. (Plaintiff's exhibit 14). Manion also points out that he apprised Hayth of the situation to determine whether rehabilitative assistance would be available to Marschand (i.e. could a position outside of Manion's department be found). If Manion actually believed that the PTSD rendered Marschand unable to work at all, he would not have been endeavoring to secure Marschand alternative employment. When Manion's letter is read in its entirety, it only expresses the view that Marschand was unable return to work in his prior position, and that efforts were being made to find him another job. Notably, Manion offers no opinion on the nature or extent of Marschand's limitations.

Marschand also claims that Hayth's deposition testimony reveals that the Railroad viewed Marschand's limitations as far broader than they were. While Marschand alleges that Hayth testified that he never considered Marschand for a position other than clerk, this mischaracterizes Hayth's testimony. During his deposition, Hayth was asked why he thought the clerk's position was a good position for Marschand. In response, Hayth stated he preferred the clerk position because it conformed to Marschand's request that he be given a low stress position away from train operation or train movement, and it also presented Marschand with the possibility of some upward mobility. (Hayth

---

10. This letter was subject to the attorney-client privilege until it was inadvertently disclosed to opposing counsel in a companion case surrounding this accident.

Dep., pp. 45–45). Hayth never opined that Marschand was not qualified for other positions on the Railroad, rather, he only expressed the view that the clerk position was Marschand's best career opportunity. (Hayth Dep., pp. 45–49).

Hayth testified further that he did not consider Marschand for the position of dispatcher because that job would put Marschand in charge of all train movement, and would place him in a high stress, tedious job. Hayth believed that such a job would not be consistent with Marschand's desire to avoid working on or around trains, or in a high stress position. (Hayth Dep., pp. 47–49). Nevertheless, disqualification from the single position of dispatcher does not constitute a significant barrier to employment generally. *Byrne,* 979 F.2d at 567; *Welsh,* 977 F.2d at 1419; *Maulding,* 961 F.2d at 698; *Partlow,* 826 F.2d at 45; *Stradley,* 869 F.Supp. 442, (E.D.La.).

The record reveals that both Manion and Hayth were operating under the assumption that Marschand could not work on or around trains, and that he may need to avoid high-stress situations. The assumption is understandable given that that is how Marschand defined himself. *Byrne,* 979 F.2d at 567. Thus, the Railroad had the perception that Marschand was precluded from working only in train service or engine service—an impairment that would not impose a substantial limitation on his ability to work. *See* discussion, *supra.* Accordingly, the Railroad did not perceive Marschand as disabled.

### 3. Reasonable Accommodation

■ Even if Marschand's PTSD could be considered a disability, his present claim would still fail. The essence of Marschand's claim is that after he suffered his breakdown and was unable to serve as an engineer, the Railroad violated its duty under the ADA to provide him with reasonable accommodation because they failed to offer him an alternative, vacant position. Unlawful discrimination includes:

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee. . . .

42 U.S.C. § 12112(b)(5)(A). A reasonable accommodation may include reassignment to a vacant position. 29 C.F.R. 1630.2(*o*)(2)(ii). Nevertheless, the ADA does not impose upon an employer the affirmative duty to find another job for an employee who is no longer qualified for the job he or she was doing. *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131–32 n. 19, 94 L.Ed.2d 307 (1987); *White v. York International Corp.,* 45 F.3d 357, 362 (10th Cir.); *Henchey v. Town of North Greenbush,* 831 F.Supp. 960, 967 (N.D.N.Y.1993); *Howell v. Michelin Tire Corp.,* 860 F.Supp. 1488, 1492 (M.D.Ala.1994). Nor does the duty to accommodate an employee require the employer to promote a disabled employee, reassign the employee to an occupied position, or create a new position. *White,* 45 F.3d at 362. Rather, the employer is precluded from "deny[ing] an employee alternative employment opportunities reasonably available under the employer's existing policies." *Arline,* 480 U.S. at 289, n. 19, 107 S.Ct. at 1131, n. 19; *Henchey,* 831 F.Supp. at 967.

■ Marschand claims that many Railroad job vacancies arose in the Ohio/Indiana area—many of which he believes he could perform. Marschand claims that based upon his own information and belief, he is qualified to perform the essential job functions for positions in the following fields:

machinist jobs, mechanical and mechanically-related jobs, electrical and jobs related to electricians' positions, signal gang, police, timber and surface gang, carpenter and extra board clerk.

(Plaintiff's exh. 18, ¶ 3).[11] Marschand alleges that a number of individuals in the Ohio/ Indiana region were hired in these respective

---

11. Marschand has argued that his PTSD is a disability because it excluded him from a broad range of jobs. One of the jobs Dr. Ross claimed Marschand could not perform was that of police officer. (Ross dep. p. 45–50). Curiously, at this juncture of his argument, Marschand now claims it was unlawful discrimination to deny him a position with the Railroad police because he was qualified for that job.

fields during the period that he was seeking reassignment.[12]

The Railroad first argues that Marschand has not shown that he was qualified for any of these alternative positions. "Obviously, the employer is not required to reassign a disabled person to a vacant position unless the disabled person is qualified for the position." *Howell*, 860 F.Supp. at 1492. A qualified individual is one who possesses the "requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). Determining whether a person is qualified involves a two part analysis:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir.1993); *White* 45 F.3d at 361.

Although Marschand has given a general listing of the areas in which he believes he could work, he failed to identify the essential job functions of any particular position he desires, and how it is that he possesses the requisite skills, experience or education for that job.[13] In fact, Marschand has "offered nothing beyond his own subjective opinion that he could perform various other jobs at [the Railroad]." *White*, 45 F.3d at 362. This general averment falls far short of Marschand's summary judgment burden. *Id.*

Additionally, the Railroad's efforts to find Marschand alternative employment were more than a reasonable accommodation. The Railroad was not required to offer Marschand the position of his choice. *Kerno v. Sandoz Pharmaceuticals Corp.*, 1994 WL 511289 *6–7 (N.D.Ill.1994). "The bottom line ... is simply that the employer must offer the employee a reasonable accommodation." *Id.* The Railroad's first attempt to accommodate Marschand occurred in March of 1992 when he was given a conditional offer of a clerk position. This accommodation was in response to Marschand's repeated requests for employment as a clerk or janitor. The offer was conditional upon Marschand's passing a typing test, but Marschand was unable to pass this test on several occasions.

When it became apparent that Marschand may not be able to pass the typing test, the Railroad involved Hayth. Hayth offered Marschand two options for employment with the Railroad. First, he offered to pay for a typing class to help Marschand qualify for the clerk position. *Id.* Hayth also offered to look at other departments for alternative employment, however, Hayth qualified this op-

---

**12.** It is questionable whether the Railroad, in fact, had the numerous vacancies Marschand suggests. In support of his contention, Marschand attached a 56 page listing of every individual (approximately 2500) hired by the Railroad since January 1, 1992. The list appears to have been a business record kept by the Railroad and produced to Marschand during discovery. Although it is a bit difficult to decipher, it does contain some reference to the hirees' job descriptions and locations. From this listing the Court finds only 5 positions filled in the Ohio/Indiana region that clearly fall under the categories Marschand claims he is qualified for: four positions with the Railroad police, and one yard clerk position in Cincinnati, Ohio. Although there may be others, the Court could not readily ascertain that information from Plaintiff's submission.

**13.** The Plaintiff attributes his inability to make such a comparison to the fact that NW does not keep a written document describing the essential functions for the jobs available at the Railroad. (Plaintiff's bf., p. 20). This is no basis to relieve Plaintiff of his summary judgment burden. The Railroad filed its motion for summary judgment on September 23, 1994. Thereafter, on October 5, 1994, Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure 56(f), to continue the deadline for his response so that additional discovery could be taken. On November 4, 1994, the Court granted Plaintiff's motion, and he was given until December 15, 1994, to complete discovery. So, even though the Railroad may not publish a listing of essential job functions, Plaintiff clearly had ample time to tailor his discovery requests to this issue.

tion with the requirement that before Marschand could be considered for any other position he would need to submit to testing with the Personnel Department "to determine if he has aptitudes and abilities for any other type of work on [the] railway company." *Id.* Concurrent with this process, the Railroad would consider further vocational training or education to accommodate Marschand. *Id.*

Marschand did accept the offer of typing lessons, and took several months of typing classes. Despite the classes, Marschand was unable to achieve the minimum typing score of 35 words per minute. Thereafter, the Railroad made an exception for Marschand and waived the typing requirement. The Railroad offered Marschand a choice of three clerical positions, and he accepted the position of extra-board clerk. It is clear as a matter of law that the Railroad made more than reasonable efforts to accommodate Marschand's request that he be reassigned to a clerk's position.

The Railroad also reasonably accommodated Marschand's request for employment in any other position. Hayth offered to assist Marschand in finding a job in another department if Marschand submitted to an aptitude test. Hayth further offered to provide Marschand with any necessary vocational training. The Railroad's offer to expend considerable resources to test and train Marschand for alternative employment was clearly a reasonable offer of accommodation. Despite this offer, Marschand never submitted to an aptitude test or requested vocational training. Thus, Marschand essentially rejected this offer of accommodation. If the employee "rejects a reasonable accommodation ... the individual will not be considered a qualified individual with a disability." *Kerno,* 1994 WL 511289 at *6 (quoting 29 C.F.R. § 1630.9(d)).

To the extent that Marschand argues that the Railroad should have reassigned him without first requiring an aptitude test, he is wrong. The Railroad need only provide him with any alternative employment opportunities reasonably available under its existing policies. *Arline,* 480 U.S. at 289, n. 19, 107

S.Ct. at 1131–32, n. 19; *Henchey,* 831 F.Supp. at 967. Hayth made it abundantly clear to Marschand that it was company policy that he submit to vocational testing and possible training before he could be reassigned. The Railroad was under no obligation to bypass this company policy in order to accommodate Marschand. *Id.*

For all of the reasons stated above Marschand has failed to make out a colorable claim under the ADA. Accordingly, the Railroad's Motion for Summary Judgment is granted.[14]

## V. CONCLUSION

The Defendant's Motion for Partial Summary Judgment in cause number 1:93–CV–134, (the FELA claim), is GRANTED. The Court grants summary judgment on the Plaintiff's claim that NW was negligent for failing to provide a trainmaster or roadforeman on the March 12, 1991 trip. The Court grants summary judgment on the Plaintiff's claim that NW was negligent for failing to provide Plaintiff with post-accident counselling. With regard to the scope of damages available to Plaintiff on his FELA claim, the Plaintiff will be limited to recovery of damages attributable to the emotional distress caused by the fear for his own safety.

The Defendants' Motion for Summary Judgment in cause number 1:94–CV–120 (the ADA claim) is GRANTED, and the clerk is directed to enter final judgment in favor of the Defendants.

---

**14.** Having granted Defendants' Motion for Summary Judgment on the merits, the Motion for Summary Judgment on the claim for punitive damages is moot.